Next case please. 312-0588, Adam Accolade v. Joe Shannon Counsel. May it proceed. Thank you and good morning. On behalf of Adam Accolade, we're asking this court to reverse the decision of the commission. This is a case we believe it can be limited to an arising out of discussion. This is a case where the claimant was working as a caregiver for my client. On the date of the accident, she was helping a patient with a shower. She had one hand on the patient, her right hand. She turned and with her left hand reached for a bar of soap. While she was helping in that process, she felt a pop in her neck. That pop then was diagnosed later as a herniation which led to surgery. It's our position that this is a case where the activities that the petitioner was performing at the time of her accident, the reaching, was an activity which does not present a risk greater than that faced by the general public. Aha, but do we take this out of context though? Because it occurs to me, this isn't somebody who is taking a shower during a break in between work shifts at the hospital. At the time this happened, she was in the process of assisting a resident in an act which she was required to perform for the safety of the resident. That's correct. So isn't that a little different than an act that you can categorize as sort of personal in nature? No, and I think the distinguishing factor here, and I guess this is what we're asking the court to do, is on that continuum between I'm at work performing my job and I'm performing a specific act, where do we draw the line and say we're looking at the activity and not the fact that the person is at work performing a task? I understand what your point is, Your Honor. It's the same thing that the Commission said. Well, she's in the shower, she's helping the patient, she's concerned for the safety, end of story. But I don't think that's what the law should be. We should be looking at whether or not the activity, perhaps that discussion would be appropriate and is appropriate for in the course of. Clearly she's in the course of. But is this act, the act of reaching an act which is a risk greater than the general public? And when we look at her testimony. Well, you said it's a risk peculiar to her employment. I don't think it is a risk peculiar to her employment. Because she's hired, her job is to help patients take showers. That's part of her job. But it's a simple act that she's performing that she performs at home that all of us perform today. Well, you could say a person working in a factory at a bench, you know, turning back and forth. Well, everybody turns. I mean, at what point do we say this person, if they're at work, doing their job, performing that act because it is part of their job, why do we even go into a neutral risk analysis? Well, I think we have to because if we look at the cases that we cited, University of Illinois, greater Peoria mass transplant and Hansel and Gretel, if we applied the analysis that the Court's talking about right now, all those cases should have been affirmed. No, okay, Hansel and Gretel, that's the person just getting up out of a chair, right? But they were at work and they were performing a work task. But it wasn't their job to get up out of a chair, okay? It was this woman's job to reach and get the bar of soap, help the person in their shower. Well, put another way, how would you respond to this comment? The cases you cited, in those cases, the claimant's employment bore no relationship to the injury for which compensation was sought. Somebody turning in a chair. It had nothing to do with the jab. Here, the employee was doing the jab when the injury occurred. Picking up on what he says and carrying your argument out to its logical extension, somebody lifting a box in a garage, people lift things all weekend at home, don't they? Exactly. So if somebody injures their back lifting a box at a job, you're saying, well, since people lift in their personal lives, they shouldn't be compensated either at work? Because lifting is not a peculiar risk to anybody. Well, but I think that in that case, what we have to look at as well is the qualitative and quantitative analysis as far as the level of the risk. And I think one thing that we've been seeing in the cases Well, why do we even get there if it is a risk peculiar to their employment? It's something that they are doing as part of their job. Why do we even go to a neutral risk analysis? I don't think that she established that this was a risk. Reaching for a bar of soap, reaching, is an act that was peculiar to this employment. Again, I mean, you know, just about every job they have to reach. So are we going to say we're going to do a neutral risk analysis every time someone is injured reaching for something? Even though, like I say, maybe they're at the machine in the factory? Well, hopefully in those cases the petitioner would put in testimony that says my job requires me to turn X number of times a day or reach X number of times a day. But you're saying he'd have to do that. He'd have to show a quantitative. I think he would. So basically practically every job we have to do a neutral risk analysis. I think you do. Now, unless you have something like carrying a box of knives down the stairs or some of the things that the court has seen over the years. But we don't have that here. She's asked specifically by the arbitrator, when did the pop in the neck happen? What were you doing when I reached for the soap? And that's consistent 776, 777, 778. I'm reaching for the soap. I'm reaching for something. I'm reaching forward. All she's doing is reaching for something. It's the same activity that she performs over and over. That's why when somebody walks down the stairs and they have an accident, we take a further analysis and we ask ourselves, what were they doing? What's the quantitative, qualitative aspect of that accident? However, they're not hired. They're not paid to walk up and down the stairs. They are paid to walk up and down stairs if they have a two-floored office and they've got to transmit between office A and office B and they're on different floors. So that analysis would apply in that situation as well. What we're asking the court to do is not just say, hey, they're at work. They're doing something that might be related. That's enough. We want you to take a look at what the activity was and say, has there been a qualitative or quantitative demonstration that this is a risk peculiar to the employment? The person is reaching. You talked about a continuum at the beginning. And for me, that's where the difficulty lies. And it also is the difficulty for you because what would be your suggested solution to this issue? If we're talking about a qualitative analysis of this, you're talking about fact-intensive analysis. Then you're back to the manifest weight. I understand. So how does that help you? I think in this case, I think it's obvious. I think it's extremely clear. I think it pushes us to the other end of the spectrum. And we have a very simple act being performed. We have no testimony as to the frequency or how that becomes peculiar to the employment. Now, if we continue to back up from the act and say, well, she was concerned for the safety. The soap might have been producing some bubbles. She was worried she was going to slip. Eventually, we get to a point where, yeah, we've got to say it's a compensable act. But I think when you look at this case on what was she doing, what is the testimony? And I keep focusing on the testimony because the medical records go everywhere. And that's one of the things that the commission seemed to do. They relied on some of the medical records. They talked about bending. They talked about lifting. But when she testified to the arbitrator, there was nothing about bending or lifting. All we have is a petitioner sitting down and an arm on the petitioner. Well, actually, this arm. And a reach out to grab the soap. It's something that everybody does as a part of their normal life. Why is this over and above? Do you always reach out for the soap while you're holding someone? Pardon me? Do you always reach out for the soap while you're holding someone? Not always. Sometimes. Hopefully sometimes. Remember, Mr. Elwood, this is being recorded. I understand. I try to keep that in mind. Your Honor, if I have one last thing I'd like to add. Doesn't that, following up on that, doesn't that, what we're doing, we're talking about qualitative analysis, which you were saying is a risk peculiar to the appointment, right? Yeah. Okay, so the qualitative analysis, you just described not just a reaching, but you described a situation where there's reaching plus another position of the body, as Justice Hoffman said, holding or trying to prevent someone from falling. That qualitative analysis would suggest that it goes beyond mere reaching. I don't think from the description that she gave at arbitration that that qualifies as anything out of the ordinary. I didn't sense a person being placed in a stressed position that would warrant additional factors favoring that. To a degree, that could be a scenario. It could be a scenario. Yeah, absolutely. I would point out this. In the greater Peoria mass transit case, we had an individual who was bending over to pick up their transfer schedule. They dropped the transfer schedule, and as they bent over, they suffered an injury. That case was deemed compensable in the Supreme Court reverse set on manifest way of the evidence. This happens in certain cases that are just on the outside of the fringe. And that's what we think this case involves. And I want to make one comment. And I want to tread very carefully on how I do this. There was a case that was decided by this Court a while back. I'm not going to talk about the facts of the case. But it was a Rule 23 case that has been published. But the Court is reserving its ruling pending a petition for rehearing. And I would say it's the Illinois State Treasurer case. I would ask this Court that you give some consideration to that case if that petition for rehearing is denied and that case becomes published. And I would ask also that if you do that, that you give both counsel an opportunity to respond in writing to that decision and argue whether we think it's applicable and obviously she'll think it's not. But I think that that case could be very important. And I would hate to see a slide through a window where we have this case decided and that comes out later when I can't make a petition for rehearing or reconsideration. So I would ask on that case, and I'll give counsel a copy when we're done. I want to talk about the facts. But it has been, there's been a ruling. The case is going to be published if the petition for rehearing is not allowed. So I think that's very important for this case and I would ask that you give some consideration to that. Thank you. May it please the Court. My name is Tracy Jones. Counsel. This is a manifesto case. I want to, rather than rehash what's in the briefs because they're extensive, I want to respond first to a couple things that counsel had said. First of all, it all boils down to a lady in a shower who is assisting somebody who needs assistance, who can't do it themselves. It's somebody who has to hold on or keep a hand on the resident so she doesn't fall. And it's somebody who's, while keeping a hold of the resident, is reaching out to move soap, not to get it to help wash her or help hand it to her, but to remove it from an area on the wall of the shower because the water was hitting it, causing soap bubbles to accumulate on the bottom, which was a further slip risk to the resident. That testimony is not disputed. In fact, in this case, the petitioner is the only one who testified. No questions were asked of her on cross-examination. And no testimony was presented by the respondent. So all you've got is the petitioner's direct testimony, which is undisputed. Counsel. Well, and could I ask you something here? Please. In terms of the histories that were given, and I may be incorrect in this, correct me if I'm wrong, but there were, in terms of the different versions that were discussed, there were different mechanisms, maybe, in terms of just exactly what this lady was doing at the time. But would you agree if the action she was taking was no more than just holding her hand out, not even providing support, but actually touching the resident, and at the same time reaching for the bar of soap? As, you know, Mr. Elwood would argue here, you're talking more of an idiopathic injury rather than something that is peculiar to this woman's employment. Okay. First, I'll address the different histories, as you refer to them. There's not different histories in the record, meaning she didn't say in one place, I was touching or holding on to the patient and I reached for the soap, and in another place she's saying, no, my hands weren't on the patient and I just turned. It's not like that. The histories are all consistent. Some are more detailed and some are less detailed. So I think if you look through the records of Dr. Lee and look at the office visit from March 16th, the day after the injury, you'll see that he notes that she was assisting a patient in a shower, and he references the word lifting, such as lifting her arm, or, you know, like one of you had indicated, lifting a box from the floor. So he says lifting, but Soriano says she had her hand on the patient and she turned at the same time to reach the soap. This wasn't, you're asking is this peculiar to the employment, how she did this, or was she simply reaching out? And my answer to that is, yes, it was peculiar to the facts of this case and to the employment. She was holding the patient and she had to both reach and turn at the same time to get the soap. She would not have had to both reach and turn if she wasn't having to keep a hand on the resident at the time she was showering her. So the specific facts of this case are very different than the facts cited by counsel in those three cases, University of Illinois, Greater Peoria Mass Transit, and Hansel and Gretel. All of those cases simply involved bending over or standing up or reaching out. So the actions bore no relationship to the employment in those cases? They didn't, not at all. There was nothing that they were doing in any of those cases that was required by the employment. She wasn't required to sit in a child's seat in Hansel and Gretel. There really isn't any connection to the employment. They didn't. You can drop, in the Greater Mass Peoria case, you can drop a piece of paper on the floor at any time, here, at work, in your home, outside, and you're going to reach over and grab it the same way. Ms. Shannon did not do that in this case. Not wanting to belabor counsel's response to one question, but most people don't assist another adult while bathing within their ordinary activities of daily life. Can I ask you a question? Please. In Peoria Mass Transit, do you think the result would have been the same as the claimant was a maintenance man whose obligation it was was to pick up dirt off the floor? That's a very good question, and I would argue that it would be. Because if his job required him to reach over repeatedly throughout his workday to pick things up off of the floor, and he sustained an injury while doing that, then yes, it would make it compensable. It's just like the guy who's working on an assembly line who has to reach for parts. Well, we reach for a cup of coffee, we reach for something off our counter, we reach for parts, but you don't do it 60 times in a minute. So it's the number of times they do it in a day. If it is increased, if it is larger than the general public. Let me ask you a question. You know, I hear that argument that it's quantitative, but what if his back went out when he picked up the first piece of paper when he first came to work in the morning? His job is still picking up the paper. If he's injured reaching over and picking up the paper, I don't think it makes a difference whether it happened the first time he picked up the paper in the morning or it happened when he picked up the 60th piece of paper. He's hired to pick up the paper. So that makes him different than someone who just happens to drop something and lean over and get it when their job isn't to lean over and get things. So I think a mass transit case would be entirely different if the claimant was a maintenance man whose job it was to pick up stuff off the floor. I don't disagree with you, and it was a well-stated point. If that job requires that activity, whether it's once a day and you're doing it the first time or multiple times a day, it is part of the employment. So you're saying that if the claimant's job duties are to assist patients in bathing, that any injury that occurs while she is assisting the patient is compensable? Not necessarily. I don't want to make it sound like this is, you know, no matter what she's doing in there, it would be compensable. For example, if she does something, let's say she's assisting the patient bathing and she reaches over and starts brushing her hair, doing something that has nothing to do with assisting the patient. That's not a compensable injury. I don't want to make it overly broad. But if she's doing something, if she is reaching... Why is it? I'm kind of interested to see why that isn't. Actually, when I said her, I meant the petitioner, the one who's injured. I'm sorry for not clarifying that. Okay, well, that wasn't clear. Yes. But if she was, for instance, grabbing the hair, that would be compensable, because that is part of her job. That is required of her in the performance of her activities. I hope I answered your question. Just reaching and handing the towel to the patient, not even touching the patient, that would be. Yes. So it's the arising of the patient. It is. And this is a manifest weight case that's before you. Counsel has asked you to reverse this decision and find that it's against the manifest weight of the evidence. Because there are so many things in this record to support the commission's decision. It's not against the manifest weight of the evidence here. Counsel, in his reply brief just very briefly, had indicated to the court that they should disregard both the opinions of the IME physicians. This is Dr. Pineda, who was seen at the petitioner's request, and this is Dr. Soriano, who was seen at the respondent's request. Even if you remove those opinions, which I don't think you can, because they're not inconsistent with each other, but even if you remove those opinions from the record, you still can rely on a chain of events theory. You still can rely on Dr. Lee's medical record, March 16th, the day after the injury, that gives a history of what occurred. And you can still find that there is evidence in this record to support the commission's decision. So I ask that you please affirm the commission's decision in all respects. And unless there's any other questions, I'll have a seat. Thank you, counsel. Counsel, you may reply. I guess I disagree with counsel because I see the comment that you're making, Justice Holder. I think if we find this case compensable, what we are doing is we're getting darn near close to a situation where anything that happens if you're at work is a compensable accident. I think we've got to stop that. No, he didn't say that, Mr. Elward. You know that. He says if you're doing something you're expected to do while working, it's compensable. If you're doing something that's not connected with what you're working, the guy that bends over and picks something up off the floor whose job it is to pick up dirty things on the floor, he's not going to be compensated. But the guy whose job it is to pick up those papers is going to be compensated. And that's the difference. And in this particular case, this woman's obligation was to assist a resident during a shower. She is holding her, touching her, while she's reaching. In addition to that, she's reaching for the purpose to remove a slip hazard in a shower. How is that not connected to what she's hired to do? I guess what I keep coming back to is we have a lady here who the medical evidence shows she had a preexisting degenerative condition. She had a longstanding neck and back problems. And she does a common activity which produces a pop in her neck. And it produces a herniated disc. And it's a common activity that she performs at any time. You take them the way you find them. I understand. You hire them the way they are. She was hired with a bad back. More likely than not, she's going to be injured in her back while doing things that might not injure other people. But that doesn't take her out of protection of the act. Thank you. Thank you. Madam, we'll be taking her into advisement. A written disposition shall issue.